Filed 5/5/16  P. v. Taylor CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br> DARWIN BERNELL TAYLOR,<br><br>        Defendant and Appellant. | A143008<br><br>(San Francisco County<br>Super. Ct. No. CT14017557) |

This appeal evokes a strong sense of déjà vu.  This is the second time we review a decision of the San Francisco Superior Court on a motion of the San Francisco Probation Department (Department) to revoke the postrelease community supervision (PRCS) of defendant Darwin Bernell Taylor. [1]  It is the second time Taylor has been accused of assaulting his girlfriend or former girlfriend, Cusandra Howard, and driving away in her truck without permission.  It is the second time Howard, after initially reporting Taylor's violent acts, failed to testify at the revocation hearing that he committed the acts of which she, in initial conversations with police, accused him.  Finally, it is the second time a trial judge hearing the revocation proceeding has, at the People's request, considered hearsay statements Howard made close in time to the events over Taylor's hearsay objection and Taylor has challenged that decision on appeal.

While the circumstances here are not identical in all respects to those that led to our earlier opinion affirming the trial court's determination that Taylor had violated

---

[1]  See *People v. Taylor* (Dec. 31, 2014, A141182) (nonpub. opn.).

PCRS, the differences do not compel a different outcome. We again find no merit in Taylor's arguments and affirm.

## BACKGROUND

### I.

### *Prior Proceedings*

As stated in our prior opinion,[2] Taylor was convicted in August 2011 of possession of a controlled substance in violation of Health and Safety Code section 11350, subd. (a) in San Mateo County and sentenced to two years and eight months in prison. In February 2013 he was released on PRCS. Seven months later, in September 2013, he was arrested for receiving stolen property in violation of Penal Code section 496, subdivision (a),[3] was found to have violated PRCS, and served 30 days in custody for that violation. In February 2014, five months after the first violation, Taylor was again arrested, this time for alleged assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)), threatening violence that would result in death or great bodily injury (§ 422), vandalism (§ 594, subd. (b)(1)) and taking a vehicle without permission (Veh. Code, § 10851, subd. (a)). The supervising agency, the San Francisco Probation Department (the department), again petitioned the court for revocation.

There was a contested hearing at which the trial court admitted over Taylor's objection a recorded telephone call made by Howard to 911 identifying Taylor as her boyfriend and stating that he threatened her with a hammer, broke the window of her car with a bottle, threatened to "kick [her] ass," and drove away in her truck without permission.[4] The court found Howard's statements fell within the excited utterance exception to the hearsay rule. Based on this and other evidence, the court found Taylor had vandalized Howard's car and violated the Vehicle Code. It again reinstated PRCS,

---

[2] Defendant has requested that we take judicial notice of our prior opinion and we hereby grant that request.

[3] Further statutory citations are to the Penal Code, unless indicated otherwise.

[4] The trial court excluded an earlier 911 call by Howard, finding her statement in that call was not an excited utterance.

but imposed a condition that Taylor serve 180 days in custody. Taylor appealed, challenging the admission of the 911 call. We affirmed the trial court.

## II.

### *Present Proceedings*

#### A.  The Probation Department's Revocation Petition

On July 8, 2014, the department petitioned for revocation of Taylor's PRCS a third time, alleging he had violated the conditions of his PRCS by engaging in illegal conduct. Specifically, the petition alleged that Taylor had been arrested by the San Francisco Police Department as a "suspect in a battery/domestic violence incident." The police report described the investigation by San Francisco Police Department officers, indicating that Howard was the victim and her boyfriend Taylor, with whom she was breaking up, had hit her. According to the report, Taylor had previously been ordered to "stay away 150 yards from the victim."

#### B.  The Court Hearing on the Revocation Petition

At a contested hearing held over three days in August 2014, the People called San Francisco Police Officers Cameron Stokes and Yasar Shah. Their testimony indicated that on June 19, 2014, at about 5:38 p.m., they were dispatched to 146 Gonzalez Drive in San Francisco on a report of an incident of domestic violence/battery. They arrived and found Howard crying, upset and distraught about the incident. She was scared and hesitant to talk. She had called her daughter, who had contacted police. She had fresh lacerations to her upper chest area and bruising and swelling on her right hand. She complained of pain to her upper chest area, the right side of her head, her neck and her right hand.

When the officers asked Howard what had happened, she told them her boyfriend or ex-boyfriend had hit her. She provided them the name of the perpetrator, Darwin Taylor, and gave them information about him. She told them she and Taylor were going through a breakup and got into a verbal argument. At some point, Taylor said, " 'Don't make me hurt you.' " Attempting to leave, Howard opened the door, but Taylor closed it. He then took her purse off her shoulder and swung it, hitting the right side of her head.

3

This caused her to fall backwards onto her back and to black out for a few seconds. Taylor also scratched her.

Howard told the officers that when she awoke, she grabbed her purse, walked out the front door, got into her truck and started it. As she was driving, she saw Taylor had jumped into the bed of the truck, so she stopped. Taylor then got inside the truck through the rear passenger door and told Howard, "Get the fuck out. I'm going to fuck you up. You're crazy." He swung his fist at her repeatedly but did not make contact. She then got out of the truck and ran away from the scene, leaving her purse behind in the truck. Taylor then got into the driver's seat and drove away with her truck. While she had previously allowed Taylor to use her truck, he did not have permission to take it that day. Howard told the officers to look for the truck at Third and Newcomb Streets in San Francisco.

While Stokes and Shah were talking with Howard, other officers arrived on the scene. Shah provided these officers the information received from Howard about Taylor to see if they could find out where he lived or obtain any information about him. They entered Taylor's information into the police department's system. They retrieved a number given to Taylor by the police department by which the department tracks persons who have been arrested and were able to obtain a mug shot of Taylor on their department-issued cell phone, which they then showed to Howard and Howard's daughter. Howard confirmed that it was Taylor, as did her daughter. Howard identified Taylor as the person who had assaulted her.

Howard told the officers that Taylor had keys to her home. She was afraid and said her children[5] would be staying with her. She said she had already requested a change in the lock because Taylor had keys and she did not feel safe.

Toward the end of the interview, the officers talked with her about an existing stay-away order that had been in place between Taylor and her. At that point, Howard became uncooperative and stopped answering the officers' questions.

---

[5] While the officers were there, Howard's son arrived.

In the meanwhile, the officers had requested an ambulance for Howard. Although the paramedics insisted that she should go to the hospital, she declined, saying she would go later.

After they left Howard's home, the officers obtained an emergency protective order and then returned to her home to serve it on her. By the time they had returned about 40 minutes later, she told them she had already changed the locks.

Stokes prepared a domestic violence report and a police report. He also prepared a stolen vehicle report, after which a warrant went out over the air regarding the incident.

After the two officers testified, the People rested.

The defense called Howard's daughter, Aisha Delacruz. Delacruz testified that Howard called her the day of the incident and "was just screaming on the phone saying, 'He hit me.'" She sounded like she was crying and was scared. Howard did not tell Aisha who the "he" was, but when Delacruz later spoke with the officers at her mother's house, she told them she thought it was Taylor because she knew there had been a past incident with Taylor and her mother, and because Taylor was "the last-known boyfriend that I knew she was around." Delacruz did not know her mother to have any other boyfriend. Her mother had not told her any time after the incident that it was not Taylor who assaulted her.

The defense then called Howard. Howard testified that she had known Taylor for 32 years. She testified that the person who assaulted her on June 19, 2014, was Deshawn Andre Williams.[6] Howard testified that on June 19, she was injured in the head and that her son took her to the hospital. When the police interviewed her, her head was hurting "really bad," her glasses had fallen off, and she was "really scared and stressed out about

---

[6] The People objected to this testimony on the ground that defendant had failed to disclose during discovery that someone named Deshawn A. Williams was the one who assaulted Howard. The trial court allowed it, stating, "All right. Well, put it this way: I am going to allow this person to testify. The fact that there has been this scenario regarding discovery will bear on the weight to be given to the testimony and any lack of ability to confirm followup, dispute the identity or the presence in the home of Deshawn A. Williams."

5

what happened." She did not remember the police asking her about who assaulted her initially. When they did so "eventually," all she told them was "[m]y boyfriend. That's the only thing that I said." She testified that she learned two days later that Taylor had been accused, went to the police station, and talked to an officer who "was upset with me." She told the officer that the police report was wrong, and the officer told her to "go to SVU" [Special Victims Unit], but it was the weekend and "they weren't even open." The following Monday, she called and talked to a Sergeant Kelly at the SVU who told her "there is no case" and "not to worry about it." And she told Taylor's probation officer about the problem when they arrested Taylor in July. She told the probation officer that she was dating someone else and gave her Williams' name.

Howard did not know how the officers who came to her home would have had Taylor's name and date of birth to run them on the system and obtain information about him. She suggested they might have obtained that information from her daughter. She suggested that when she had told them her boyfriend had done it, her daughter said, " 'Oh, this has happened before' " and "stuff like that." Howard did not say anything then, but now she guessed her daughter was talking about Taylor. However, according to Howard, "that was a different situation than this."

Howard denied that the officers had shown her pictures of Taylor. She suggested her daughter was "uncomfortable with [her] dating anybody outside of their father" and "uncomfortable" with Taylor. That was why she had not told her daughter she had started dating Williams. She did not remember anyone mentioning Taylor's name at any time while the police were at her house.

Howard had gotten to know Taylor's 82-year-old mother, who lived in Stockton, and had seen her "[a]bout a week ago." Howard had a "really good relationship" with and was "really close" to, Taylor's mother; Howard said she "consider[ed] her my mom." Howard was concerned that Taylor's father had recently been released from the hospital after suffering strokes and a heart attack.

6

Howard denied receiving a copy of a restraining order regarding Taylor in February 2014. She denied having any contact with Taylor between February 2014 and July 7, 2014, including on June 19, 2014.

On cross-examination, Howard was unable to say where Williams worked or where he lived, other than to say sometimes in New York and sometimes in San Francisco at hotels, although she was unable to state the names of the hotels where he stayed or what events he worked on in San Francisco during the period she was seeing him. The last time she saw him was on June 21, 2014, when she went to the police station and he was in the car. Williams had come with her "[b]ecause I told him I didn't want someone else to get in trouble for what he did. And he was like, 'Well, okay. My mom didn't raise me to be like that, so I guess I will do it.' "

Howard testified that on June 19 she was hit with her purse. It was "heavy," about 10 pounds, and contained a tablet, her credit cards and "a lot of stuff." She said Williams had returned it to her house. At the time she was "in shock." She had "never been hit before." It was "distressing" and "embarrassing."

Howard said she had lived with Taylor for six months. At one point, he had permission to drive her truck and had a set of keys to it.

In February 2014, Taylor threatened her and drove off with her truck. She and Taylor had a fight and she told him she wanted the truck back. She later got it back with help from the police. A service called OnStar had located it. On June 19, 2014, the person who assaulted her took her truck. She found it on June 20, 2014. It was parked a couple of blocks from her house. Williams left a note on her door saying where it was parked. The truck that was taken in February 2014 was the same truck that was taken in June 2014.

After the February incident, Howard spoke to the district attorney's office about coming to court to testify, but she did not come to court and she did not testify. She did not receive a subpoena.

On rebuttal, the People called Nati Ramirez, an employee in the subpoena unit of the district attorney's office. She testified that the district attorney's office sent a

7

subpoena to Howard on February 10, 2014.  The office did not receive back an envelope stating "Return to Sender" or anything else indicating that Howard had not received the subpoena.

## C.  Trial Court's Ruling

After hearing the evidence, the court expressed concerns about Howard's credibility, but took the matter under submission.  The following week, the court ruled "that by a preponderance of the evidence . . . defendant is in willful violation of the conditions of his community supervision."

After hearing on both sides regarding disposition, the court ordered the reinstatement of PRCS with the same conditions, except the court ordered defendant to participate in a 52-week domestic violence prevention program and serve 100 days in county jail, with credit for 40 days already served.  The court set aside the previous stay-away order and entered a criminal protective order prohibiting defendant from harassing, assaulting, following or taking various other actions with respect to Howard, requiring him to surrender any firearms and prohibiting him from attempting to dissuade or prevent any person from attending a hearing, testifying or reporting to law enforcement.  The court also prohibited defendant from having any contact with Howard or coming within 50 yards of her or 150 yards of her residence.  Defendant was subject to a warrantless search condition and required to enter any programs deemed appropriate by the probation department.

Defendant timely appealed.

## DISCUSSION

Defendant challenges the trial court's order modifying his PRCS, claiming it is based on inadmissible hearsay in violation of defendant's due process rights.[7] Specifically, he contends Howard's statements to police are hearsay, do not fall within

---

**7**  In the court's minutes for the revocation petition hearing, it states, "Defendant is advised and admits the violation of Mandatory Supervision."  However, the People do not contend defendant did so, or argue forfeiture in this appeal.  Therefore, we address the merits of defendant's appeal.

8

the spontaneous statement exception to the hearsay rule, and therefore the court should not have admitted them. Defendant acknowledges that in a PRCS revocation hearing, otherwise inadmissible testimonial hearsay is admissible on a showing of good cause. He argues that the court should have, but did not, require a showing of good cause for admitting Howard's statements, thereby violating his due process rights, and that this error was prejudicial under the federal constitutional standard.

## I.

### *Relevant Legal Standards*

We begin with the relevant law. Since the enactment of California's Criminal Justice Realignment Act of 2011 (the Realignment Legislation) (Stats. 2011, ch. 15 § 1), "a prison sentence for certain felons ends with county-administered community supervision in lieu of parole." (*People v. Isaac* (2014) 224 Cal.App.4th 143, 145.) Specifically, "felons whose crimes fall short of certain severity criteria are 'subject to community supervision' for up to three years if 'released from prison on and after October 1, 2011.' (§ 3451, subd. (a).) Community supervision is to be 'provided by a county agency designated by each county's board of supervisors' and should be 'consistent with evidence-based practices, including, but not limited to, supervision policies, procedures, programs, and practices demonstrated by scientific research to reduce recidivism among individuals under postrelease supervision.' (*Ibid.*)" (*Ibid.*)

PRCS is governed by sections 1203.2 to 1203.3 and sections 3450 to 3465. Sections 1203.2 and 3455 govern revocation proceedings and permit the supervising county agency to petition the court to revoke, modify or terminate PRCS for violation of conditions imposed as part of PRCS. (§§ 3455, subd. (a), 1203.2, subd. (b).)[8] It requires a hearing within a reasonable time after a revocation petition has been filed. (§ 3455, subd. (c).) The court may take any of the above steps "[u]pon a finding that the person

---

[8] The statutes also allow the supervising agency, upon arrest of a supervised person for alleged violations of the conditions of his or her PRCS, to return the person to PRCS with modified conditions. (*People v. Gutierrez* (2016) 245 Cal.App.4th 393, 400.) However, certain sanctions, including revocation, can only be imposed by the court. (*Gutierrez*, at p. 400; § 3455, subd. (a).)

has violated the conditions of postrelease community supervision." (§ 3455, subd. (a).) Legislative findings accompanying a 2012 amendment to the Realignment Legislation state that "[i]t is the intent of the Legislature . . . to provide for a uniform supervision revocation process for petitions to revoke probation, mandatory supervision, postrelease community supervision, and parole." (Stats. 2012, ch. 43 (S.B. 1023), § 2, subd. (a).) The findings also state the amendments are intended to "simultaneously incorporate the procedural due process protections held to apply to probation revocation procedures under Morrissey v. Brewer (1972) 408 U.S. 471 [*Morrissey*], and People v. Vickers (1972) 8 Cal.3d 451, and their progeny." (*Id.* § 2, subd. (b).)

The due process rights established in *Morrissey* for parole revocation proceedings are not " ' "the full panoply of rights due a defendant [in a criminal prosecution]." ' " (*People v. Rodriguez* (1990) 51 Cal.3d 437, 441.) They do, however, include "(1) written notice of claimed violations, (2) disclosure of adverse evidence, (3) the right to confront and cross-examine witnesses, (4) a neutral and detached hearing board, and (5) a written statement by the fact finders as to the evidence relied on and the reasons for revocation." (*Ibid*.) The standard of proof is preponderance of the evidence. (*Id.* at p. 447.)

"*Morrissey* emphasized that 'the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial' (408 U.S. at p. 489 [33 L.Ed.2d at p. 499]), and further explained that '[o]bviously a parolee cannot relitigate issues determined against him in other forums, as in the situation presented when the revocation is based on conviction of another crime.' (408 U.S. at p. 490 [33 L.Ed.2d at p. 499.)" (*People v. Arreola* (1994) 7 Cal.4th 1144, 1153 (*Arreola*).) In *People v. Maki* (1985) 39 Cal.3d 707, 716–717, the California Supreme Court held that documentary evidence such as a car rental invoice obtaining the defendant's signature was sufficiently trustworthy to allow its admission in evidence in a probation revocation proceeding.

But in *Arreola*, our Supreme Court reaffirmed its prior holding "requiring a showing of good cause before a defendant's right of confrontation at a probation revocation hearing can be dispensed with by the admission of a preliminary hearing

10

transcript in lieu of live testimony." (*Arreola*, *supra*, 7 Cal.4th at p. 1159.) It distinguished *Maki*, observing: "There is an evident distinction between a transcript of former live testimony and the type of traditional 'documentary' evidence involved in *Maki* that does not have, as its source, live testimony. (See 2 Witkin, Cal. Evidence (3d ed. 1986) § 901 et seq.) As we observed in [*People v.*] *Winson* [(1981) 29 Cal.3d 711], the need for confrontation is particularly important where the evidence is testimonial, because of the opportunity for observation of the witness's demeanor. (29 Cal.3d at p. 717.) Generally, the witness's demeanor is not a significant factor in evaluating foundational testimony relating to the admission of evidence such as laboratory reports, invoices, or receipts, where often the purpose of this testimony simply is to authenticate the documentary material, and where the author, signatory, or custodian of the document ordinarily would be unable to recall from actual memory information relating to the specific contents of the writing and would rely instead upon the record of his or her own action." (*Arreola*, at p. 1157.) "The broad standard of 'good cause' is met (1) when the declarant is 'unavailable' under the traditional hearsay standard (see Evid. Code, § 240), (2) when the declarant, although not legally unavailable, can be brought to the hearing only through great difficulty or expense, or (3) when the declarant's presence would pose a risk of harm (including, in appropriate circumstances, mental or emotional harm) to the declarant." (*Id.* at pp. 1159–1160.)

Similar to the good cause requirement adopted by the California Supreme Court, the Ninth Circuit has applied a balancing test to determine whether hearsay evidence may be admitted in proceedings to revoke supervised release (See *United States v. Comito* (9th Cir. 1999) 177 F.3d 1166, 1171), which approach has been endorsed by some California appellate courts as nearly identical to the standard articulated in *Arreola*. (See *People v. Stanphill* (2009) 170 Cal.App.4th 61, 79 (*Stanphill*).)

Regardless, it is not clear that either a good cause showing or application of a balancing test is required to admit hearsay that falls within an exception to the hearsay rule. As the Court of Appeal for the Third District observed in *Stanphill*, the cases that discuss good cause and balancing have not done so in the context of evidence that was

11

admissible under a hearsay exception. (*Stanphill, supra*, 170 Cal.App.4th at pp. 79–80.) In *Maki*, the California Supreme Court stated that if the evidence admitted in that case had been properly admitted under exceptions to the hearsay rule, there would be "no need to inquire as to whether and what flexible standards may be applied to the use of otherwise inadmissible documentary evidence in revocation proceedings." (*Maki, supra*, 39 Cal.3d at 710.) Although the *Stanphill* court described this statement by our high court as "dictum," it went on to hold that evidence admissible under the spontaneous statements exception was not subject to a further balancing or good cause standard. (*Stanphill*, at pp. 80–81.) We find its reasoning persuasive and quote it in full:

"We believe spontaneous statements under [Evidence Code] section 1240 are a special breed of hearsay exception which automatically satisfy a probationer's due process confrontation/cross-examination rights without the court having to find good cause for the witness's absence under *Arreola* or perform the *Comito* balancing test. 'The theory of the spontaneous statement exception to the hearsay rule is that since the statement is made spontaneously, while under the stress of excitement and with no opportunity to contrive or reflect, it is *particularly* likely to be truthful. As explained by Wigmore, this type of out-of-court statement, because of its "superior" trustworthiness, is "*better than* is likely to be obtained from the same person upon the stand. . . . ." (6 Wigmore, Evidence (Chadbourn ed. 1976) § 1748, p. 199, italics added.) Unlike other hearsay exceptions in which the unavailability of a witness makes it "necessary" to resort to hearsay as a weaker substitute for live testimony (5 Wigmore, Evidence (Chadbourn ed. 1974) § 1420, p. 251), the spontaneous statement exception involves a "necessity" of a different sort: "[T]hat we cannot expect, again, or at this time, to get *evidence of the same value* from the same or other sources" (*id.* at § 1421, p. 253, italics in original) and "[t]he extrajudicial assertion being better than is likely to be obtained from the same person upon the stand, a necessity or expediency arises for resorting to it." (6 Wigmore, Evidence, *op. cit. supra*, § 1748, p. 199.) This is why unavailability of the declarant as a witness need never be shown under this exception. [Citations.]' [¶] Given this unique nature of spontaneous statements, we believe the reliability and necessity inherent in such

12

evidence automatically establishes good cause for denying confrontation sufficient to render balancing unnecessary." (*Stanphill*, *supra*, 170 Cal.App.4th at p. 81.)

The spontaneous statement exception to the hearsay rule is codified in Evidence Code section 1240, which makes admissible notwithstanding the hearsay rule evidence of a statement if it "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant" and "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." The admissibility requirements are "well established." (*People v. Merriman* (2014) 60 Cal.4th 1, 64 (*Merriman*).) " ' "(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' " (*Ibid.*)

We apply a deferential standard of review to probation revocation decisions. "We review a probation revocation decision pursuant to the substantial evidence standard of review [citation], and great deference is accorded the trial court's decision, bearing in mind that '[p]robation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court. [Citations.]' [Citation.] [¶] 'The discretion of the court to revoke probation is analogous to its power to grant the probation, and the court's discretion will not be disturbed in the absence of a showing of abusive or arbitrary action. [Citations.]' [Citation.] 'Many times circumstances not warranting a conviction may fully justify a court in revoking probation granted on a prior offense. [Citation.]' [Citation.] ' "[O]nly in a very extreme case should an appellate court interfere with the discretion of the trial court in the matter of denying or revoking probation. . . ." ' [Citation.] And the burden of demonstrating an abuse of the trial court's discretion rests squarely on the defendant." (*People v. Urke* (2011) 197 Cal.App.4th 766, 773.)

13

The standard of review is similar for evidentiary rulings. "Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*Merriman*, *supra*, 60 Cal.4th at p. 65.) Substantial evidence is defined as " ' "evidence which is reasonable, credible, and of solid value." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

## II.

### *Analysis*

We begin our analysis by determining whether the trial court erred in admitting Howard's statements to Stokes and Shaw at defendant's revocation hearing under the spontaneous statements exception to the hearsay rule. We start here because we agree with the court in *Stanphill* that if the spontaneous statement exception to the hearsay rule is established, no further good cause or balancing test need be applied in the revocation context.

There can be little question that there was an "occurrence startling enough to produce . . . nervous excitement" in Howard. There is no dispute that there was an assault, and one that knocked Howard to the ground and rendered her unconscious for a short period, that she was injured and that she was threatened with violence and her car was taken. Even aside from her statements to the officers, Howard testified to most of these facts as a witness for the defense. She testified that on June 19 when she was hit with her purse, it was "heavy," about ten pounds, and contained a tablet, her credit cards and "a lot of stuff." She also testified that the assault caused her pain and injured her to a degree that she went to the hospital. And she testified that the person who assaulted her took her truck. In *Merriman*, the victim told her friend, who testified, that the defendant had "grabbed her neck and started choking her while his mother stood by and did nothing." (*Merriman*, *supra*, 60 Cal.4th at p. 65.) Because the victim's statement

14

"described a physical assault by defendant," the court held, "it clearly satisfied the requirement that the statement in question relate to an occurrence that was startling enough to cause nervous excitement." (*Id*. at 66.)

Nor can there be any question that there is substantial evidence supporting a finding that Howard's statements were made " ' "before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." ' " (*Merriman*, *supra*, 60 Cal.4th at 64.) Howard herself testified that when the police interviewed her she was "really scared and stressed out about what happened," that she was "in shock," that she had "never been hit before" and that the assault was "distressing" and "embarrassing." Howard's daughter, Delacruz, who was also a witness for the defense, testified that when her mother called her after the incident she "was just screaming on the phone saying, 'He hit me.' " She testified that her mother sounded like she was crying and was scared. And there was the officers' testimony as to their observations of Howard, whom they described as crying, upset and distraught about the incident and appearing scared and hesitant to talk. They observed fresh lacerations to her upper chest area and bruising and swelling on her right hand, and she complained of pain to her chest, head, neck and hand. The injuries were enough to cause them to call an ambulance, and paramedics urged her to go to the hospital. And Howard told them she was afraid because Taylor had keys to her home and her children were going to stay with her. All of this amply supports the trial court's implied finding that Howard's statements to the officers were made in the heat of the excitement and distress resulting from the incident and before there was time for fabrication. (See *Merriman*, 60 Cal.4th at p. 66 [record amply supported finding that victim spoke to her friend while she was under the "stress of excitement" and before there was time to contrive or misrepresent because friend testified that victim was in defendant's house for only 20 minutes and was upset and angry when she returned].)

Defendant argues that Howard's statements to the officers do not support a finding of a spontaneous statement because they were made "some time after the perpetrator had left and after the danger had passed." He also argues that because Howard had called her

15

daughter, who in turn called 911, and the police arrived after that, "[a]mple time had passed since the incident." He points out that Delacruz testified that her mother had been crying while on the phone with her but was not crying any longer at the time the police arrived. He relies as well on the fact that Howard "identified her attacker in response to [the officers'] questions," and contends responses to questions suggest time for deliberation and reflection.

In so arguing, defendant misperceives our task in reviewing the trial court's finding for substantial evidence. The question is not whether there is any evidence that would support a finding contrary to the one made by the trial court, but whether there is substantial evidence supporting that finding. There is in this case.

Further, defendant's arguments are devoid of merit, such as his arguments about passage of time. Defendant cites no case holding that the spontaneous statement must be made while the incident is ongoing and the victim remains in danger, and we are aware of none. Further, the evidence does not support defendant's argument. Delacruz's testimony indicates Howard called her after the incident "just screaming," from which we can infer the incident had just occurred. Delacruz's testimony suggests she immediately drove to her mother's house, calling 911 while en route. She testified that the police arrived at the house "probably two minutes" after she did. The CAD[9] recorded the time San Francisco Police dispatchers entered the 911 call as 5:34 p.m., and the time Shah input information and sought additional information about the suspect as 5:59 p.m. It also showed they arrived back at the police station at 6:38 p.m. This evidence indicates the 911 dispatch, officers' arrival at Howard's home, interview of her and her daughter, retrieval of additional information including defendant's mug shot, departure from Howard's home and return to the police station all took place within 64 minutes. Although the evidence does not show precisely how much time elapsed between Howard's call to Delacruz and Delacruz's arrival at Howard's home, the fact that the San

_____

[9] This term, as used by the officers, apparently refers to a computerized method of recording the times of occurrences or steps taken by officers in responding to or investigating a matter.

16

Francisco officers reached Howard's home within two minutes of when Delacruz arrived there suggests a fairly short travel time. This is further indicated by the fact that within 25 minutes of the dispatch, the officers were already taking information obtained from Howard and her daughter and using it to seek more information from the department's database.

Moreover, the determination of whether there was time for reflection or whether the declarant was still in a state of excitement is not solely based on the precise amount of time between the event and the statement, at least where there is other evidence indicating the declarant's state of mind. In *People v. Gonzales* (2012) 54 Cal.4th 1234 (*Gonzales*), the California Supreme Court affirmed application of the spontaneous statement exception to testimony by the brother-in-law of the defendant's wife that the wife had told him after an incident some time earlier, during which defendant had hit her. (*Id*. at p. 1270.) The defendant argued there was no evidence to support the spontaneous statement exception, but the court concluded there was based on the brother-in-law's testimony that the wife was "crying when she telephoned and asked him to come and get her, crying when he picked her up from the defendant's parents' house, and still upset and crying when she described the fight that day during which defendant hit her." (*Id*. at p. 1271.) Here, not only does the evidence indicate that relatively little time passed between the incident and the police officers' interview of Howard, but also the officers testified that she was crying, upset, distraught and scared when they spoke to her, and she herself testified she was in shock and distressed about what had happened when the officers interviewed her.

Defendant's arguments that Delacruz testified that Howard was no longer crying by the time the officers arrived is, in essence, a request that we credit Delacruz's testimony over that of the officers, and ignore Howard's own testimony about her state of mind. That is not our role on substantial evidence review. We consider whether there is substantial evidence in favor of the trial court's ruling, not whether there is any evidence that would support a different one. And it is the trial court's province, not ours, to assess the relative credibility of the witnesses. Similarly, defendant's argument that the fact that

17

Howard was answering questions is a factor that weighs against a finding that her statements were spontaneous amounts to a request that we reweigh the evidence. That is not our function.

As the California Supreme Court stated in *Gonzales*: " ' "[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement.' " (*Gonzales*, *supra*, 54 Cal.4th at p. 1071.) Here, the trial court's determination that Howard's statements were admissible was well within its discretion.

Because the trial court did not err, we need not reach the parties' arguments as to whether the claimed error was prejudicial.

## DISPOSITION

The trial court did not abuse its discretion in finding that Howard's statements to Stokes and Shah were spontaneous statements within the hearsay exception of Evidence Code section 1240. Since the statements were admissible under that exception, the court was not required to make a finding of good cause or apply a balancing test before admitting them. We therefore affirm.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*People v. Taylor* (A143008)